**CURTISS–WRIGHT CORPORATION et al., Plaintiffs,**

v.

**KENNECOTT CORPORATION et al., Defendants.**

**No. 80 Civ. 6643.**

United States District Court, S. D. New York.

Dec. 26, 1980.

Wachtell, Lipton, Rosen & Katz, New York City, for plaintiffs; Bernard W. Nussbaum, Lawrence B. Pedowitz, New York City, Barry A. Weprin, Brooklyn, N. Y., of counsel.

Sullivan & Cromwell, New York City, for defendants; Marvin Schwartz, David B. Tulchin, and Jane B. Baron, New York City, of counsel.

Mordecai Rosenfeld, New York City, for intervenor.

## OPINION AND FINDINGS

MILTON POLLACK, District Judge.

THE COURT: This is an application for a preliminary injunction. The defendant Kennecott has made a tender offer to purchase up to 49 percent of the common stock of the plaintiff Curtiss-Wright for a price of $40 a share. The offer is scheduled to expire on December 26, 1980 at midnight.

Curtiss-Wright and three of its directors* contend that the tender offer is defective but anomalously, nonetheless, seek a preliminary injunction to prevent Kennecott from terminating its offer to buy Curtiss-Wright stock. Kennecott refuses to extend to a later date its offer to buy Curtiss-Wright stock and insists that its offer will properly expire at 12:00 midnight on December 26, 1980.

Kennecott through KC Development on November 28, 1980 offered to buy up to 4,100,000 shares, approximately 49 percent, of the common stock of Curtiss-Wright at a price of $40 a share. The offer states that

_____
* All four individual plaintiffs are directors of Kennecott, three are also directors of Curtiss-Wright.

Kennecott intends, following completion thereof, to seek to effectuate a tax free merger pursuant to which the remaining Curtiss-Wright shareholders would receive Kennecott stock worth $40 for each remaining share of Curtiss-Wright common stock.

This is not a proxy contest for selection of directors of a corporation in which a popular choice is to be registered, nor is it a plenary review of the wisdom of the exercise of the business judgment of directors in respect of corporate acquisitions and compensation arrangements or the efficiency of the performance of the management of a corporation.

The case before the Court concerns whether the federal requirements have been met for tender offers and whether any criticized corporate transactions or activities involve the threat of irreparable damage which cannot be adequately dealt with on the merits in an ordinary damage suit.

The issues presented are virtually all factual in which credibility plays a significant, if not decisive role.

I

*Value of the Stock to be Purchased*

Both parties to this dispute agree that the stock sought to be purchased by the offer is worth $40 a share and the opponents of the tender offer contend that it is worth more than that.

T. Roland Berner, the leader of the opposition to the tender offer (he is chairman, president and chief executive officer of Curtiss-Wright, which would be absorbed in the proposed merger) testified:

"The Court: Mr. Berner, in your opinion, was the Curtiss-Wright stock worth $40 a share to a purchaser?

"The witness: Yes.

"The Court: Is there any objection that you know of in modern corporate practice against buying something which is worth what you are paying for it?

"The Witness: Not—if you do it for an improper motive, yes, it is improper." (R.275).

"The Court: Suppose you are getting what you paid for and in addition you get rid of Berner. Is there anything wrong with that?

"The Witness: If they got all of the values, if they got all of the values that represented their investment and they got me thrown in, that would be all right, but if there was purpose to get me out regardless of investment value, then they ought to go to Kennecott's stockholders and ask them if that is what they want." (R.277–78).

Speaking of his talks with the president of Kennecott, Mr. Barrow, and with Mr. Wendel, the former president who currently is Kennecott's technical consultant (he was selected last Friday upon motion of Mr. Berner) Mr. Berner testified:

"I did educate Mr. Barrow and Mr. Wendel that in our (Curtiss-Wright's) judgment the additional certain special segment of our business made our stock worth, back in November (the time of the Kennecott offer)—we did a computation which showed a $49-plus value for Curtiss-Wright.

"THE COURT: He is a smart man to try—

"THE WITNESS: Oh, I think he is.

"THE COURT: Would you sign a paper to that effect, that he's a smart man?

"THE WITNESS: To buy Curtiss-Wright for $40, Wendel is a very smart man to buy Curtiss-Wright for $40." (R. 252)

It may be useful to recall *Rodman v. Grant Foundation*, 608 F.2d 64 (2d Cir. 1979), involving a challenge to a repurchase plan for previously issued stock. The Second Circuit affirmed this Court's grant of summary judgment against the plaintiff. In response to plaintiff-appellant's argument that the defendants' desire to entrench their control was the principal, if not sole reason for the repurchase program and that this was not disclosed to shareholders, the Second Circuit stated:

The District Court also held that corporate control is recognized to be of universal interest to corporate officers and directors and that the failure of proxy materials to disclose this subjective interest is not a violation of the securities laws . . . . Here the proposed actions of the company and their effect on stockholdings were fully disclosed . . . In the absence of some ulterior wrongful design hinging upon so-called "entrenchment", the directors were not required to put forth in the proxy materials and analysis of their otherwise obvious interest in company control. Id. at 71.

## II

### *The Business Purpose of the Directors of Kennecott*

After personnel of Kennecott for more than a year of considering the so-called "business fit"—the business benefits which might result from a business combination of Kennecott and Curtiss-Wright—the directors of Kennecott voted on November 21, 1980 to make the tender offer for Curtiss-Wright stock here in question. Not a single vote by any director was cast against the resolution of the Board—the vote in favor was unanimous. Messrs. Berner and three of his co-directors, all of whom were on both Boards of Kennecott and Curtiss-Wright, abstained from voting, following the lead of Mr. Berner, who demanded and got a roll-call vote made alphabetically, in which he was the first name called, and he "abstained". None of the abstainers at the meeting asked for more time to consider the matter. Nobody said there was no business purpose for the tender offer, and none of the abstainers challenged the vote or the tender offer authorized or impugned the proposal in any way at the meeting.

Mr. Wendel, the technical consultant of Kennecott, who enjoys the confidence and support of Mr. Berner, as already mentioned and evidenced by the extension of his employment contract only last week on the motion of Mr. Berner, gave conclusive, credible testimony, the credibility of which was not impugned in any degree, that there is a

valid "business fit" for the combination and that this was what he, as a director, with the other members of the Board, voted for in approving the tender offer. His opinion and that of the other directors, voiced in effect by their affirmative vote, coincided with the similar opinion of Morgan Stanley & Company, which examined into the question and found a reasonable business fit flowing from the merger. The testimony to the contrary and the speculations and conclusions to the contrary offered on behalf of the plaintiffs are not worthy of belief.

Mr. Berner's present antipathy to such a combination as devoid of a business purpose other than the admitted adequate value to be received for the price proffered, is seriously impugned by the history of his own activities on the subject of a merger of the two companies lasting nearly a year.

In mid-1979 Kennecott officers began to consider the business benefits that might result from a business combination of Kennecott and Curtiss-Wright. Apparently this consideration was sparked by the announcement of Curtiss-Wright that it would increase to 100 percent its equity interest in its subsidiary, Dorr-Oliver, Incorporated. Kennecott's officers and directors and others investigated and studied the desirability of such a combination at various times during 1980, continuing up to and including November 21, 1980.

Beginning in December 1979 Kennecott officials proposed to Mr. Berner that Kennecott and Curtiss-Wright merge. This occasioned a number of discussions that started in December 1979 and continued on and off until October 1980. During these discussions Mr. Berner raised no question of an absence of a business purpose for such a merger. To the contrary, he indicated his enthusiasm and interest in such a merger and discussed possible prices for the Curtiss-Wright stock and on one occasion suggested that Curtiss-Wright acquire for $40 a share the shares of Curtiss-Wright held by Teledyne, the largest stockholder of Curtiss-Wright, as a prelude to a merger and also discussed the possibility of his, Mr.

Berner's, becoming a vice chairman of the combined entity.

During January 1980 Mr. Berner arranged to have Kennecott supplied with intimate and said to be confidential information pertaining to each of the nineteen divisions of Curtiss-Wright, useful in evaluating a possible business combination, most of which information was not then and perhaps is not even now publicly available. This included financial results of operations, forecast profitability and planning data for each of the operating divisions of Curtiss-Wright, including 1977–1978 results of operations and 1979 estimated results of operations and projections for 1980. All this was useful in evaluating the business fit between Curtiss-Wright and Kennecott.

In addition, Mr. Berner advised Mr. Barrow, the president of Kennecott, that the Dorr-Oliver subsidiary of Curtiss-Wright net earnings were projected to increase 100 percent in the next five years.

At a later time, Mr. Berner even mentioned that he had an offer for this subsidiary of $100 million.

During the April 1980 and July 16, 1980 meetings of the Kennecott Board and the Finance Committee respectively, both of which Mr. Berner attended, the possible merger of Kennecott and Curtiss-Wright was discussed without any objection from Mr. Berner or any suggestion that there was no proper business purpose of such an event. An assessment of a good business fit between the two companies was explained in detail at the April 1980 meeting of the Kennecott Board.

In June 1980, Mr. Berner suggested to Mr. Barrow that he would be willing to consider a sale of Curtiss-Wright to Kennecott.

At the July 16, 1980 meeting of the Finance Committee a task force of Kennecott's directors was appointed to consider the possible benefits of a business combination with Curtiss-Wright. Mr. Berner confirmed his willingness to discuss a merger. The task force pursued the inquiry during the summer of 1980 and concluded that

further information about Curtiss-Wright, possibly from its auditors, should be sought.

Following the Kennecott Board meeting of August 15, 1980, Mr. Barrow and Mr. Berner again discussed the question of a possible merger. Mr. Barrow asked whether Kennecott could meet with the Curtiss-Wright auditors to obtain the additional data desired. Mr. Berner demurred, suggesting that questions concerning Mr. Barrow's employment compensation be cleared up, a matter then under Board consideration.

On September 11, 1980, Mr. Berner, at his request, met with Mr. Barrow at the offices of a Curtiss-Wright subsidiary in Connecticut. Mr. Berner raised the issue of a business combination of the two companies. Mr. Berner said he was thinking of a plan to acquire Teledyne's stock interest in Curtiss-Wright but that the market price was not propitious for a tax-free exchange if the Curtiss-Wright stock was to be valued at $40 a share. The matter was again deferred (Exhibit L).

On October 17, 1980, Mr. Barrow met with Mr. Berner to discuss where they could go on their discussion of a possible merger. Mr. Berner this time produced a calculation of how Curtiss-Wright could be valued at a possible $52 a share. Mr. Barrow talked about the business fit of the companies. Mr. Berner, however, was reluctant to go forward.

By letter addressed to Kennecott's president, dated October 29, 1980, Mr. Berner advised that he did not wish to pursue any longer the subject of a possible merger, and two days later, October 31, 1980, Curtiss-Wright notified Kennecott that it was filing under a Federal law, the Hart-Scott-Rodino Antitrust Improvements Act, to permit Curtiss-Wright to increase its holdings of Kennecott common stock to 25 percent of the outstanding shares.

Mr. Berner testified herein that Curtiss-Wright bought into Kennecott because it believed that Kennecott was an undervalued situation. The tender offer seeks to acquire what the principal figure of Curtiss-Wright has openly testified to be an under-valued stock and at a purchase price considerably less than Mr. Berner's testimony of full value. This vindicates the business judgment of the Kennecott directors, apart from all else.

It is clear and the Court finds that Kennecott's directors exercised their business judgment in *good faith for a proper, bona fide corporate purpose* in authorizing the tender offer at the meeting of the Board on November 21, 1980. This was a regular meeting, legally convened and duly conducted, and the actions taken thereat were entirely consistent with the practical construction of the business purpose to be drawn from the conduct of Mr. Berner, indicated above, over a period of nearly a year.

The offering circular frankly noted that the necessary effect of a merger would eliminate Mr. Berner and his coterie of nominees of Curtiss-Wright on the Kennecott Board *in the future*, when and if a merger became effective, and correctly stated that this, however, was not the primary reason for the tender offer, albeit an auxiliary plus.

The circular reads (Page 26):

"Kennecott recognizes that the acquisition of the Company (Curtiss-Wright) would result in the acquisition of the block of Kennecott common stock held by the Company and would eliminate the need to deal with future representation by nominees of the Company on the Kennecott Board of Directors and related matters covered by the December 1978 agreement between the Company and Kennecott described in Section 10 of this Offer to Purchase. However, this is not the primary reason for the Offer and the Company's continued ownership of the block of Kennecott common stock is not a condition to the Offer. See Section 14 of this Offer to Purchase."

### III

*The 1978 Settlement Agreement is not a bar to the Tender Offer.*

Throughout the 1979–80 merger talks with Mr. Berner, his submission of inside

data on Curtiss-Wright divisions, the Kennecott task force studies, the speculations on a merger price in cash or stock and allied matters, two thorny matters in which Mr. Berner exhibited interest, kept cropping up. Mr. Berner wanted an extension for another three years of an agreement that the companies had made in settlement of proxy litigation in 1978. That agreement insured representation on the management slate of directors of seven men designated by Curtiss-Wright, and Mr. Berner wanted a downward revision of Mr. Barrow's original and later revised compensation arrangements with Kennecott.

These matters were injected almost every time that the merger talks took place, and, without expressing them, the implications were clear: Mr. Berner wanted another three-year agreement with Kennecott in respect to his right to designate members of the Board, or else there might break out a proxy fight when the compensation issue and the alleged improvident acquisition of the Carborundum Company, which, as mentioned below, had triggered the first proxy fight, would come to the fore again.

In March 1978, Curtiss-Wright had announced to Kennecott that it had purchased and held 9.9 percent of Kennecott's outstanding common stock and requested minority representation on the Kennecott Board and suggested the nomination of a joint slate of candidates to stand for election at the May 2, 1978 annual meeting of Kennecott shareholders. When this was turned down Curtiss-Wright announced that it was initiating a proxy contest for control of Kennecott upon a platform which included a program that Kennecott should try to sell Carborundum Company for more than the purchase price which Kennecott had paid for it, $567 million in cash, and then distribute the proceeds of the sale to the Kennecott shareholders. Curtiss-Wright viewed the purchase price to have been excessive.

By approximately a 5-to-4 vote, the Kennecott management slate prevailed at the May 2, 1978 stockholders meeting.

However, the stockholders' vote was set aside by court order in December 1978 by the Circuit Court of Appeals, Second Circuit, and a new election was set for January 1979.

On December 15, 1978 Kennecott and Curtiss-Wright entered into an agreement which settled the litigation and provided for the election of a joint slate of directors of Kennecott consisting of eighteen members, seven of whom were designees of Curtiss-Wright. Among those seven were the four individual plaintiffs herein, three of whom were directors of Curtiss-Wright.

The parties also agreed to submit the reconstituted board of Kennecott for election at the 1979 and 1980 Kennecott annual shareholder meetings and Curtiss-Wright agreed that it would not engage in any proxy contest for directors relating to such meetings.

The agreement by its terms expires just prior to the May 1981 stockholders' meeting and is not to be effective in connection therewith.

Curtiss-Wright further agreed not to increase its holdings in Kennecott stock above 21 percent, a figure apparently chosen to accommodate the possibility of combining the earnings of the two companies for corporate purposes if desired.

In addition, Kennecott and Curtiss-Wright agreed to a three-person committee to make an objective study of the Curtiss-Wright proposal to divest Carborundum and possibly distribute the proceeds to Kennecott's stockholders. The committee so selected, with the advice of the banking firm of Lazard, Freres & Co., reported in 1979 that it was in the best interests of Kennecott and its shareholders that Carborundum remain a wholly owned subsidiary of Kennecott.

In this suit Curtiss-Wright claims that the tender offer "scuttles" the settlement agreement and, albeit that it does not say so, that the agreement was intended to say or be understood as saying that neither company could while the agreement was in force attempt to take over the other. The

intentions of the parties in entering into the settlement agreement are simply and clearly recited in the 1978 settlement agreement itself which states in relevant part:

"4. The best interests of Kennecott and its stockholders would be served by (a), the elimination of a costly, time-consuming and diversionary proxy contest and (b), the removal of uncertainty with respect to the status of the board of directors of Kennecott. Accordingly, the parties have agreed to a reconstituted board of directors ... in Kennecott's and its stockholders' best interests."

The settlement agreement contains no provision barring or even suggesting a bar against Kennecott from acquiring or seeking to acquire any or all of the voting securities of Curtiss-Wright or from obtaining or even seeking to obtain representation on the board of directors of Curtiss-Wright. There is no credible evidence of an intention or understanding on anyone's part that the agreement should restrict such acquisition by Kennecott or a merger of Kennecott with Curtiss-Wright. No one considered, spoke of or intended such a restriction; that is a plain afterthought convenient to the new situation that has arisen.

There is no ambiguity in the settlement agreement which is to be resolved, nor does the attempted parol evidence credibly establish the intent which the plaintiffs contend was a part of the understanding. The agreement was a carefully constructed, lawyered agreement in which the intent is expressed, not omitted or left in doubt. The case authorities clearly would reject the attempt made here to inject a new term, even if it had been, as it was not, credibly established.

"[T]he law in New York is clear that a court may not in the guise of interpreting a contract rewrite it to express the real intention of the parties if to do so would contradict the clearly expressed language of the contract. *Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 292 N.Y.S.2d 878, 239 N.E.2d 628 (1968); *Peripheral Equipment, Inc. v. Farrington Mfg. Co.*, 29 A.D.2d 11, 285 N.Y.S.2d 99 (1967). See

*Morlee Sales Corp. v. Mfrs. Trust Co.*, 9 N.Y.2d 16, 210 N.Y.S.2d 516, 172 N.E.2d 280 (1961)." *Reed v. Knollwood Park Cemetery, Inc.*, 441 F.Supp. 1144, 1148 (E.D.N.Y. 1977).

"The basic objective of contract interpretation must be to determine the intention of the parties from the language employed, *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973), as gleaned from the several provisions of the Agreement. *Laba v. Carey*, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 618, 277 N.E.2d 641, 644 (1971). Courts may not under the guise of interpreting a contract to give effect to the parties' 'real' meaning, rewrite the Agreement 'if to do so would contradict [its] clearly expressed language' ..., *Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 386, 292 N.Y.S.2d 878, 881, 239 N.E.2d 628, 630 (1968) (citations omitted), but are required to adjudicate the parties' rights 'according to the unambiguous terms of the contract and therefore must give the words and phrases employed their plain meaning.' *Laba v. Carey*, supra, 29 N.Y.2d at 308, 327 N.Y.S.2d at 618, 277 N.E.2d at 644 (citations omitted). Accord, *Central New York Freightways, Inc. v. Deperno*, 60 A.D.2d 750, 400 N.Y.S.2d 946 (4th Dept. 1977); *Allied Chemical Corp. v. Alpha Portland Industries, Inc.*, 58 A.D.2d 975, 397 N.Y.S.2d 480 (4th Dept. 1977)." *Matter of Robertson Class Plaintiffs*, 479 F.Supp. 657, 668–69 (S.D.N.Y.1979).

"[M]ere disappointment in [plaintiff's] expectations does not permit the Court to make a new contract for the parties or to insert protective conditions which the parties failed to provide for themselves." *Parks v. Baldwin Piano & Organ Co.*, 262 F.Supp. 515, 519 (D.Conn.) *aff'd*, 386 F.2d 878 (2d Cir. 1967).

### IV

*The Barrow Family Stock Purchases*

The tender Offer circular sets out in minute detail the fact of purchases by Barrow family members of 26,800 shares of Curtiss-

Wright stock in open market transactions during the period January 25, 1980 through February 5, 1980 at prices between $26⅞ and $28⅜ per share. Within a month or so 3,500 of these shares were sold at a loss of about $35,000.

In November 1980, within days of the vote on the tender Offer, and up to November 17, the Barrows sold an additional quantity of these shares, 12,500 shares, at a loss of about $22,000, and on November 21, 1980, the day the tender Offer was authorized, they sold 2,000 shares at a gross profit of about $20,000. They continue to hold 12,300 shares presently. All of the stock was carried on margin, at interest costs of something above the rates on brokers' loans, and, of course, they incurred brokers' commissions on the transactions.

The purchase charges were financed, according to the tender offer disclosure, by proceeds of a loan obtained by Mr. Barrow, Sr., from a Texas bank and reloaned to his children, the loans being evidenced by a series of $3,000 notes signed by them. The ultimate alleged purpose was to annually forgive the $3,000 notes to the extent that no gift tax would be incurred by Mr. and Mrs. Barrow.

The transactions occurred in the midst of the conversations which were being had with Mr. Berner and bank advisers concerning possibilities of a merger and amidst the receipt of the details of the Curtiss-Wright financial data previously mentioned giving the details of finances, operations and projections for Curtiss-Wright for 1978, 1979 and 1980.

The tender Offer states that Kennecott has been advised that the purchases and sales were made by the Barrow family members without knowledge of any kind regarding Kennecott's intention to commence the tender Offer prior to the time that such intention was made public on November 21, 1980.

Further, Mr. Barrow, Sr., has advised Kennecott that he had no involvement in the investment decisions of his family in Curtiss-Wright stock and until November 21, 1980 was unaware thereof and disclaims any beneficial ownership in the stock.

At the trial Mr. Barrow and his son maintained the same positions as are expressed in the tender Offer circular.

The plaintiffs seriously question the truth of the disclosures in the tender Offer circular and assert that the reasons given and the statements therein are a misrepresentation and violation of federal securities law and regulations and that thereby the tender Offer is vitiated on that account.

For purposes of the present proceeding the Court will go so far as to assume a constructive attribution to Mr. Barrow, Sr. of all of the family transactions. Even if so viewed for the sake of argument, the scope of the transactions falls far short of matters to be deemed significant enough to affect the validity of a tender Offer involving $164 million or whether a shareholder should or should not sell his stock.

The question raised by the Barrow family stock purchases is trivial in respect to an otherwise legitimate tender Offer by Kennecott and without material affect on the public interest. No matter what one believes or should believe about the exculpatory statements reported to Kennecott about the stock transactions, the offering circular of the corporation is not so misleading nor are the statements so material on the matter presented as to warrant preliminary injunctive relief against the corporation.

Moreover, in the longer run should plaintiffs' theory of the occurrences prove correct and warrant a legal recovery of the fruits of the purchases, there is a sufficiently adequate remedy at law available which if Kennecott were entitled to the recovery could amount to a maximum gross of about one-half cent a share for each share of Kennecott's stock for the 3,315,900 shares of Kennecott's stock outstanding or if Curtiss-Wright could in some way claim the recovery, it could amount to a maximum gross of under two cents a share of Curtiss-Wright stock for the 8,267,000 shares outstanding. These figures would assume a gross profit from the purchases of $150,000 which the evidence shows is inflated because of ex-

penses by at least 50 percent. Compare *Tanzer Economic Associates, Inc. v. Haynie*, 388 F.Supp. 365 (S.D.N.Y.1974), (Frankel, J.). Certainly no seller's investment decision would rationally be affected by the Barrow stock matter in deciding whether to sell his or her Curtiss-Wright stock to Kennecott at $40 a share.

## V

*Unofficial Gatherings of Cliques of Directors*

The plaintiffs complain herein that from time to time, but particularly the night before the Board of Directors met and voted to authorize a tender Offer, a group of the directors met with the president, Mr. Barrow, to discuss such a corporate matter in an informal assembly to which all of the directors were not invited and some of whom did not come.

The evidence showed that on occasion Mr. Berner met informally with fewer than all of the director members of committees of Kennecott to discuss Kennecott's corporate matters to which meetings some of the committee members were not invited and did not come.

The plaintiffs would have this Court enjoin the action taken at the official board meeting, where an official vote was taken with all directors present, on the authorization of the tender Offer because of an unofficial gathering of directors on the previous evening to discuss tentatively such an offer. To state plaintiffs' contention is to show its absurdity. Free informal assembly, selected company and free speech at convocations where both sides agree that no official action was attempted or taken or claimed does no violence to any corporate law or precept known to this Court.

Suffice to say, there is no provision of law or in Kennecott's bylaws that precludes or renders invalid, resolutions reached at officially called and constituted formal meetings of the board of directors or the board's committees on the ground that the subject matter of those resolutions had previously been considered or discussed unofficially at informal meetings of some of the directors, but not all, and some of the members of the board on committees, but not all, due to lack of universal invitation thereto.

Plaintiffs have even gone to the extreme of suggesting that the 1980 election of directors by Kennecott's stockholders should be set aside because the proxy statement failed to say that those up for election on the agreed management slate planned to meet selectively and unofficially and informally on occasion to talk of Kennecott business. This rises to the height of absurdity and there is no legal merit to that position.

## VI

*Compliance With Federal Requirements*

Kennecott commenced the tender Offer on November 28, 1980 under Rule 14d–2(b)(2) by complying with the filing and notice requirements of Rule 14d–3(a) and disseminating tender Offer materials pursuant to Rule 14d–4. Specifically, on November 28, 1980:

A Tender Offer Statement on Schedule 14D–1 was filed with the Securities and Exchange Commission (SEC) and delivered to Curtiss-Wright at its principal executive offices pursuant to Rule 14d–3(a).

A summary advertisement of the Offer, a copy of which has been admitted in evidence, was published pursuant to Rule 14d–4(a)(2)(i) in all editions of The Wall Street Journal of November 28, 1980. The Wall Street Journal is a daily newspaper with a national circulation within the meaning of Rule 14d–4(b), as it is distributed nationwide and reports average daily circulation of approximately 2 million copies.

Approximately 30,000 copies of an Offer to purchase containing the information prescribed by Rule 14d–6(e)(i) were printed and made available for distribution on November 28, 1980 pursuant to Rule 14d–4(a)(2)(ii) and otherwise. Distribution pursuant to that rule was, however, precluded after the afternoon of December 1, 1980 by the New Jersey State Court injunction described hereafter.

Although distribution of the Offer to Curtiss-Wright shareholders is not required by law, on November 28, 1980 Kennecott delivered to Curtiss-Wright a request pursuant to Rule 14d–5(a) requiring Curtiss-Wright to elect under Rule 14d–5(a)(3) either to mail the Offer to purchase to its shareholders pursuant to Rule 14d–5(b) or to deliver a list of its shareholders to Kennecott pursuant to Rule 14d–5(c) so that Kennecott could do the mailing.

Curtiss-Wright responded orally to this request stating that it was not obliged to choose between the two options at that time because of the New Jersey State Court injunction.

On the afternoon of December 1, 1980, three days after the commencement of the Offer, the Chief of the Bureau of Securities of the State of New Jersey, who the Court reasonably infers was catalyzed to act at the instance of Curtiss-Wright, sought and obtained a temporary restraining order against continuance of the Offer from the Appellate Division of the New Jersey Superior Court. Curtiss-Wright appeared in that lawsuit as an *amicus curiae* urging the grant of injunctive relief. Kennecott opposed the injunction on the ground that the New Jersey Corporation Takeover Bid Disclosure Law under which the injunction was issued was preempted by the federal law, the Williams Act, and was, therefore, unconstitutional. Kennecott had made the same argument before the United States District Court for the District of New Jersey in an action it commenced on November 21, 1980 to clarify the apparent conflict between the state and federal law, but the district court had denied Kennecott's request for preliminary injunctive relief against enforcement of the New Jersey Act.

By the time the Appellate Division of the New Jersey Superior Court issued its order of temporary restraint against continuance of the Offer, the Offer to purchase had already been widely disseminated.

The printing firm of Charles P. Young & Company had been instructed to print 17,-585 copies of the Offer to purchase and 19,620 copies of the letter of transmittal and to deliver a total of 15,000 copies of the Offer to purchase and 17,000 copies of the letter of transmittal to the information agent, the firm of D. F. King & Co., Inc., and to the dealer manager, Morgan Stanley & Company, Incorporated, at the opening of business in New York City on the morning of Friday, November 28, 1980.

D. F. King had been retained by Kennecott prior to November 28, 1980 for the purpose of assisting in the dissemination of the tender Offer materials relating to the Offer and of answering inquiries about the Offer from interested persons. The addresses and telephone numbers of D. F. King's offices in Chicago, New York and San Francisco were set forth in the summary advertisement of the Offer that appeared in The Wall Street Journal on Friday, November 28, 1980.

Between the morning of Friday, November 28, 1980 and the time on Monday, December 1, 1980 when further dissemination of the materials was enjoined, 6,563 such sets were disseminated. A majority of the sets of Offers to purchase and letters of transmittal were disseminated to 169 brokerage houses, including virtually all of the nationally known firms, and over eighty bank and trust nominees, including the major New York City banks as well as central New York banks. Brokerage houses obtained such documents, as is well known, for the purpose, among others, of disseminating copies to their clients and customers who are beneficial owners of the securities in question.

A press release was issued on November 21, 1980 announcing Kennecott's intention to make the Offer and the Offer's material terms, and the Offer has since received substantial press coverage right down to date.

Thus, through press coverage, the mailing of over 6,500 copies of the Offer to Purchase to brokers, dealers and financial institutions throughout the country and the availability of such copies to interested shareholders, wide dissemination of the Offer to Purchase was achieved prior to the time that the New Jersey Appellate Divi-

sion Court issued the injunction mentioned above.

On December 3, 1980, two days after the state court injunction was entered, Curtiss-Wright sent a letter to its shareholders opposing Kennecott's offer and characterizing it as inadequate, not in the best interests of the company or its shareholders and as raising substantial legal questions under federal and state law. Kennecott at that time failed to respond, under the restraint that had been imposed.

On December 17, 1980, the United States Court of Appeals for the Third Circuit reversed the New Jersey District Court's denial of Kennecott's request for preliminary injunctive relief, finding that the New Jersey Act's commencement provisions conflict with federal law and that, therefore, "there is a reasonable likelihood that Kennecott will prevail in the contention that the Williams Act and the regulations" promulgated thereunder "pre-empt New Jersey's take over rule." That case is cited as *Kennecott Corporation v. Smith*, 637 F.2d 181 at 191 (3d Cir. 1980). The Court's opinion states: "We have held no more than that the New Jersey provisions delaying 'commencement' of a tender offer beyond the five day period conflict with the SEC regulations under the Williams Act."

The Third Circuit did not rule, nor was it requested to rule, on the date at which the offer was "commenced" under the applicable law and rules, leaving that to the District Courts, if required to be determined.

On December 19, 1980, the District Court in New Jersey entered a preliminary injunction barring enforcement of the New Jersey Act against the Offer. Consistently, on the same day the Appellate Division of the Superior Court of New Jersey vacated its order restraining Kennecott from taking any steps in furtherance of the offer. By letter dated December 18, 1980, Curtiss-Wright finally notified Kennecott that it would mail Kennecott's offering materials. Kennecott was not required by the Williams Act or the SEC rules to arrange for such mailing.

On December 24, 1980, the Court of Appeals, Third Circuit, notified this Court that it had on the preceding day denied a stay sought by Curtiss-Wright against the order of the New Jersey Federal District Court which had enjoined enforcement of the New Jersey Act against the Offer.

Curtiss-Wright has now moved herein for a preliminary injunction restraining Kennecott from closing the offer on December 26, 1980. Curtiss-Wright bases its motion on Rules 14d–7(a)(1) and 14e–1(a). The first of those rules provides that a tendering shareholder has withdrawal rights "until the expiration of fifteen business days from the date of commencement" of the offer. The second of those rules provides that a tender offeror must hold its offer "open" for at least "twenty business days from the date such tender offer is first published or sent or given to security holders."

Kennecott's offer commenced on November 28, 1980. Therefore, the withdrawal rights provided by Rule 14d–7(a)(1) expired at 12:00 Midnight, December 23, 1980, which was the fifteenth business day from the date of commencement. Not only is this conclusion correct as a matter of law, but its adoption works no conceivable injury to any shareholder: Curtiss-Wright's shareholders have been prevented from tendering by Curtiss-Wright's recourse to state laws challenged as invalid under the Supremacy Clause, but not having tendered, they are in at least as good a position as they would be had they actually tendered and then sought to withdraw. The purpose of Rule 14d–7(a) is to give security holders a longer period to reconsider their decision to deposit their shares. See SEC Release Nos. 33–6158, 34–16384, IC–10958, November 29, 1979, and Comment on Rule 14d–7. This purpose of the rule has been fully met.

Likewise, Kennecott's offer was first published on November 28, 1980, and the minimum offering period of twenty business days from such date prescribed by Rule 14e–1(a) will expire on December 26, 1980. Kennecott has not withdrawn or terminated its offer. It has held it open since November 28th. The fact that Curtiss-Wright's

shareholders may have been, but it has not been credibly established other than by hearsay, unable to tender by reason of Curtiss-Wright's conduct in derogation of Federal law has not operated to prejudice the interests of those Curtiss-Wright stockholders in the factual circumstances of this case. The purpose of Rule 14e–1(a), like Rule 14d–7(a)(1), is to prevent a stampede by the shareholders to accept an offer of excessively short duration and to permit instead adequate time for reflection so as to reduce the likelihood of hasty, ill-considered decision making. See SEC Release Nos. 33–6158, 34–16384, IC–10958, November 29, 1979, Comment on Rule 14e–1.

The inability to tender shares has not prevented, but has actually forced deliberate consideration of the tender offer— hasty, ill-considered decision making has been entirely foreclosed. Kennecott would not violate the SEC rules if it adheres to its intention to close the offer at midnight on December 26, 1980. *Raybestos-Manhattan, Inc. v. Hi-Shear Industries, Inc.,* 4806 F.Supp. 80, No. 80–C–2730, (Eastern District of New York, Dec. 16, 1980), *Crouse-Hinds Company v. InterNorth, Inc.,* No. 80–CV–722 (Northern District of New York, 12/5/80). In *Hi-Shear Industries* the following language in an apposite case applies.

"In this case, the target corporation, not the offeror, sought to delay the opening of the offer. The defendant cannot be held to have violated Rule 14e–1 when the offer was open for less than twenty business days, not because of conditions placed on the offer by the defendant but because of injunctive orders requested by the plaintiff."

In the *Crouse-Hinds* case, cited supra, the Court analyzed the situation which also confronts this Court in the following language:

"If the twenty-day rule were interpreted to mean that a tender offeror must be able to receive tendered shares for a continuous period of twenty business days, then any form of interruption for even an hour would make the offeror unable to keep its offer 'open', and, consequently, a tender offeror would have to recommence the offer ... If a tender offeror had a recommence its offer two or three times, [then] in the typical case sixty days would elapse, and the 'conditional' withdrawal rights triggered sixty days into an offer would commence. In plaintiffs' view, at this point, a shareholder would have two separate types of withdrawal rights. A guaranteed withdrawal right under the fifteen-day provision and a 'conditional' withdrawal right under the sixty-day provision.

"The Court does not believe that Congress or the SEC would have intended this result ... [A]ll a target company would have to do to frustrate a hostile takeover attempt would be to make timely applications to different courts or concerned State or Federal agencies to enjoin the tender offer, for the sole purpose of forcing the offeror to start the offer over again ... It seems doubtful that the public would benefit from such a situation, because shareholders would be wondering whether they had learned of the 'latest offer' ... [T]he Williams Act was designed to avoid 'tipping the balance' in the tender offer transaction in favor of or against the tender offeror or the target company ... [T]he Court finds that plaintiff has failed to demonstrate irreparable harm and either probable success on the merits or sufficiently serious questions going to the merits so as to make them fair grounds for litigation on its claims that InterNorth has violated the 'summary publication' or the 'twenty-day' rules of the SEC."

Kennecott is and has been in full compliance with the SEC's tender offer rules since it commenced its offer in accordance with Rule 14d–2(b)(2) on November 28, 1980. The full protection of the SEC's tender offer rules has been afforded to Curtiss-Wright shareholders.

## VII

The only question to be addressed is whether a credible showing has been made that if an injunction is not granted irreparable harm will follow from the acquisition

of Curtiss-Wright stock by Kennecott. To that question the Court must address the likelihood of success on the merits of the claims pertinent to the validity of the tender offer or, in the alternative, to determine whether questions sufficiently serious to make them a fair ground for litigation have been presented.

As indicated, the issues presented are essentially factual, and the matters involving credibility are resolved by the Court in favor of the defense. The offering materials for the tender Offer and the proxy for the 1980 stockholders meeting were neither false nor misleading in any material respect pertinent thereto. Plaintiffs have failed to show the requisite irreparable harm in each instance. Moreover, they have failed to show the likelihood of success on the merits of the claims material to the validity of the tender Offer or the 1980 meeting and have failed to demonstrate, in the alternative, that there are questions sufficiently serious that are material and pertinent to the tender Offer or the 1980 stockholders' meeting and any legally cognizable or factual hardships tipping decidedly in plaintiff's favor.

No director who voted in favor of the tender offer breached any fiduciary obligation to any Kennecott shareholder by so voting.

The use of the Williams Act requirements to attempt to hobble a tender offer with discordant views such as have been assimilated here is hardly the purpose of the legislation.

At all events, the motion for a preliminary injunction is in all respects denied, with costs to be assessed against the plaintiffs.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

So Ordered.