CALEB & CO. and Unit & Co., partnerships, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

E.I. DuPONT de NEMOURS & COMPANY, First Jersey National Bank, and Conoco, Inc., Defendants.

No. 84 Civ. 4075 (RWS).

United States District Court, S.D. New York.

Dec. 28, 1984.

Breed, Abbott & Morgan, New York City, for plaintiffs; Thomas A. Shaw, Jr., Thomas W. Kelly, Noah Nunberg, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant E.I. DuPont; Ronald S. Rolfe, Alan R. Glickman, New York City, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant First Jersey; Job Taylor, III, William K. Dobbs, New York City, of counsel.

## OPINION

SWEET, District Judge.

This case arises out of a corporate merger that was, at the time of its occurrence in the summer of 1981, the largest corporate takeover in history. Caleb & Co. and Unit & Co., ("Caleb"), as representatives of a class of tendering shareholders, allege that defendants E.I. DuPont de Nemours and Co., ("DuPont"), First Jersey National Bank, ("First Jersey"), and Conoco, ("Conoco"), in structuring and carrying out the merger, violated section 14(e), Rule 14e–1(c), Section 10(b), and Rule 10(b)–5 of the Securities Exchange Act of 1934 by intentionally delaying payments due tendering shareholders and not revealing an intention to delay these payments. DuPont and First Jersey have brought this motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss for failure to state a claim. The motion is denied in part and granted in part, and the alleged period of delay is determined to commence from the date of termination of the tender, August 17, 1981, rather than the date of acceptance of the shares, August 5, 1981.

**Alleged Facts**

For the purposes of this motion, the material allegations as contained in Caleb's complaint are taken as admitted. *See Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15

L.Ed.2d 247 (1965). In determining the legal sufficiency of the claims stated, the exhibits annexed to the complaint are considered as well. Fed.R.Civ.P. 10(c).

On July 15, 1981, DuPont issued its prospectus (Exhibit C of the complaint) to all Conoco shareholders, including Caleb, offering them a choice of $95 cash or 1.7 DuPont shares for every Conoco share tendered in accordance with the offer. Two weeks later, because DuPont's tender offer was hotly contested by two other bidders, Joseph E. Seagram & Sons, Inc. and Mobil Oil Corporation, DuPont increased the number of shares it would accept for cash, and on August 4, DuPont increased its cash offer to $98.00 per share, prompting Mobil to increase its offer to $120.00 per share.

Midnight, Tuesday, August 4 was the termination of the withdrawal period for Conoco shareholders who had tendered to DuPont and was also the expiration of the waiting period applicable to DuPont's tender offer under the Hart-Scott-Rodino Act. Consequently, August 5 was the first date upon which DuPont could accept shares tendered pursuant to its cash offer and bind itself contractually to purchase tendered shares. The prospectus stated that the termination date of the tender offer was August 17, unless extended, and defined the method of acceptance of shares as follows:

Upon the terms and subject to the conditions of the Offer, the exchange of DuPont Shares or cash for Conoco Shares validly tendered and not withdrawn will be made as promptly as practicable after the latest of

(i) the tender of such Conoco Shares,

(ii) 12:00 Midnight, New York City Time, on August 4, 1981,

(iii) approval by the Du Pont stockholders of the proposal to amend the certificate of Incorporation of Du Pont to increase the authorized number of Du Pont Shares and to approve the issuance of Du Pont Shares in connection with the acquisition of Conoco, at a meeting called for August 17, 1981,

(iv) the expiration of the waiting period applicable to the Offer under the

HSR Act in connection with the Purchaser's acquisition of the Conoco Shares or

(v) with respect to any Conoco Shares not theretofore accepted for exchange, the expiration of any withdrawal period resulting from the commencement of a tender offer for Conoco Shares by another bidder.

*Notwithstanding clause (iii) above, the Purchaser reserves the right (but shall not be obligated) to accept Conoco Shares in exchange for cash prior to Du Pont stockholder approval.* If the Purchaser exercises such right and Du Pont stockholder approval is not obtained, Du Pont Shares will not be issued to tendering stockholders and the Merger will not occur .... (emphasis added)

Pursuant to the underlined portion of the provision, DuPont announced in its August 6 supplement to the prospectus that: "[T]he purchaser has accepted for exchange for cash pursuant to the offer, all Conoco shares validly tendered with an election for cash prior to 12:00 midnight, New York City time on Monday, August 3, 1981 and not withdrawn."

Caleb alleges, and DuPont concedes, that as of August 5, DuPont was therefore contractually committed to purchase for cash at least 38.7 million shares at $98.00 per share. Although DuPont had initially announced that only 37.3 million shares were tendered for cash prior to August 3, and that 1.4 million additional shares could therefore be tendered for cash, DuPont later conceded that as of August 3, in excess of 38.7 million shares had been tendered for cash, and no share tendered for cash to DuPont on or after August 4 would be accepted by DuPont.

On August 4, the day before DuPont formally accepted the shares tendered for cash, DuPont and First Jersey amended the July 15 Exchange Agent Agreement between them. According to Caleb the amendment was designed to delay payments due Conoco shareholders who had tendered for cash. The complaint states that each tendering shareholder was re-

quired, in the letter of transmittal, which was part of DuPont's offer, to appoint First Jersey as: "the true and lawful agent and attorney-in-fact of the undersigned (with full knowledge that the said Exchange Agent also acts as agent of the Purchaser) ... to deliver certificates for such [tendered] Conoco shares ... upon receipt by the Exchange Agent, as agent of the undersigned ... of cash at the price per share specified ..." According to the terms of the letter of transmittal, after First Jersey received cash for the tendered shares, it would issue its "check in payment ... payable to the ... undersigned."

Caleb alleges that changes in the amended Exchange agreement were designed to permit delays in this initial plan for payment. Under the original Exchange Agent Agreement, First Jersey was required, upon receipt from DuPont of the funds, to proceed as follows:

> "You shall thereupon, *as promptly as possible after the delivery of such funds* ... prepare and send to each tendering stockholder, consistent with the provisions of this Agreement and the Letter of Transmittal, a *check* for the amount of cash ... to which he is entitled as provided in the Offer."

Both underlined phrases were eliminated from the August 4 Amendment. Instead of a "check" to be sent to tendering stockholders, the August 4 Amendment substituted a "draft, payable through you as Exchange Agent for the Purchaser" (these drafts are hereafter referred to as "payable-through drafts"). The earlier requirement, that First Jersey send its checks (now payable-through drafts) to the tendering stockholders "as promptly as possible," was eliminated.

Caleb alleges that as a result of the substitution of payable-through drafts for checks, no cash was required to be delivered to First Jersey, as the tendering shareholders' attorney-in-fact, prior to these instruments being sent to the tendering shareholders. Such cash payment to their attorney-in-fact would, under the Letter of Transmittal, have constituted cash payment to the tendering shareholders. Under the amendment, Caleb alleges, the cash delivery was delayed until after the payable-through draft had been mailed by First Jersey to the tendering shareholder, received and deposited into a bank account by the tendering shareholder, and returned, presented to, and accepted by First Jersey and DuPont. The delays inherent in payable-through drafts, as opposed to checks, Caleb alleges, resulted in intentional delays in payments due tendering shareholders.

The complaint alleges that DuPont, in furtherance of its plan not to pay tendering shareholders promptly, caused and permitted Unit & Co.'s payment of $921,984 for shares tendered before August 3 and accepted on August 5 to be delayed until after September 21 and Caleb's payment of $1,005,774 to be delayed until on or after September 1. Further, the complaint alleges that in excess of $2.5 billion in payments due potential plaintiff class members was delayed beyond the "due date," defined as five days following acceptance of the shares by DuPont. The complaint further alleges that DuPont accomplished its undisclosed plan to delay payment not only through the devices of the August 4 amendment, but also "by deliberately using and permitting the use by First Jersey of personnel, equipment, facilities, procedures, and outside computer services which were inadequate for and incapable of causing payment to be made either promptly or as promptly as practicable."

**Conclusions**

In examining the complaint on this motion to dismiss for failure to state a claim, the governing rule is that:

> [T]he office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof .... [A] complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.

*Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). *Gitterman v. Vitoulis,* 564 F.Supp. 46 (S.D.N.Y.1982).

### A. Count One: Rule 14(e)–1(c)

Caleb alleges as a first count that DuPont breached its obligation under Rule 14e–1(c), 17 C.F.R. § 240.14e–1(c), promulgated pursuant to Section 14(e) of the Securities Exchange Act of 1934, by not paying "promptly." Rule 14e–1(c) states: "As a means reasonably designed to prevent fraudulent, deceptive, or manipulative practices within the meaning of section 14(e) of the Act, no person who makes a tender offer shall:

.        .        .        .        .

(c) Fail to pay the consideration offered or return the securities deposited by or on behalf of security holders promptly after the termination or withdrawal of a tender offer.

Section 14(e) of the Act, codified at 15 U.S.C. § 78n(e) states:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. *The commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.* (emphasis provided).

DuPont asserts that in order to allege a cause of action under Rule 14e–1(c) it is necessary to assert that the violating party acted with scienter when it paid impromptly. Further, DuPont claims that 14e–1(c) applies only to the post-*termination* period—here supposedly subsequent to August 17—not to the post-*acceptance* period— here subsequent to August 5. Caleb claims, on the other hand, that to plead a 14e–1(c) violation properly no allegation of scienter need be stated and that the obligation of prompt payment was triggered by acceptance of the shares, on August 5.

**Scienter**

■ DuPont argues that there is an equivalence between the requisites of actions under §§ 14(e) and 10(b) of the Securities Act, and that section 10(b) has "long been understood [to] strike solely at *fraudulent misrepresentation*," meaning "intentional conduct, that is, conduct undertaken with scienter." It is true that in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) the Supreme Court established that Rule 10b–5 did not proscribe negligence and in *Sante Fe Industries v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Court stated that the rule struck only at manipulative or deceptive practices. Further, it is true that actions brought directly under § 14(e) have been analyzed just as actions brought under § 10(b). *See, e.g., Chris Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362–63 (2d Cir.1973); *Atchley v. Qonaar Corp.*, 704 F.2d 355, 359 (7th Cir.1983); *Pryor v. United States Steel Corp.*, [current] Fed.Sec.L.Rep. ¶ 91,- 568 (S.D.N.Y.1984).

However, the relationship between Rule 14e–1(c) and § 14(e) differs from that between Rule 10b–5 and § 10(b). Rule 10b–5 proscribes manipulative, deceptive, and fraudulent acts generally, just as does § 10(b). The courts, in defining these terms, have necessarily added clarity to these general proscriptions such that they have become virtual "terms of art." *Ernst & Ernst, supra*, 425 U.S. at 199, 96 S.Ct. at 1384. However, section 14(e) gave the Commission authority, "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." Within this authority, the Commission drafted the prohibitions defined by Rule 14e. Rather than rely on a rule which prohibits fraudulent activity generally, while leaving the courts to define the scope of that term as the Commission did with 10b–5, the Commission exercised its authority to create specific rules

and regulations which are reasonably designed to prevent fraud. In doing so the Commission created an absolute prohibition that "no person who makes a tender offer shall" fail to pay promptly. While Rule 10b–5 strikes only at acts which are themselves fraudulent or deceptive, as defined by the courts, the rules issued pursuant to § 14(e) are reasonable exercises of administrative authority designed to prevent fraud in tender offers. Thus, 14e–1(a) prohibits any person from keeping a tender offer open for less than twenty business days, not because every tender offer kept open for less than twenty days would involve fraud, but because the Commission can reasonably exercise its duty to prevent fraud by forbidding that any tender offer be kept open for less than twenty days. Similarly, rule 14e–1(c)'s requirement that no person shall fail to pay promptly creates liability even where no scienter is alleged or proven, because the Commission, in a reasonable exercise of authority, believed that prohibiting all such imprompt payments would prevent fraud within the meaning of the Act. *Cf. Gerstle v. Gamble-Skogmo,* 478 F.2d 1281, 1300–01 (2d Cir.1973).

SEC Exchange Act Release No. 16384, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,373 at 82,597 demonstrates this reasoning. The Release states: "Rule 14e–1(c) has been revised to require a person making a tender offer to pay the consideration ... promptly .... The commission believes that this provision will protect investors by ensuring that deposited securities are not tied up for an unreasonable length of time ... after the termination of a tender offer." The Commission in drafting the requirement for prompt payment, eliminated the requirement of a finding of scienter and exercised its authority to structure tender offers such that fraudulent or deceptive actions would be eliminated.

The only prior case analyzing Rule 14e–1(c), cited by counsel, *Pryor, supra,* at 98,910 held that a claim had been properly pled where the plaintiff alleged merely a delay in payment, devoid of an allegation of scienter. While actions brought directly under the statutory section 14(e), which

prohibits only fraud and manipulative practices generally, require a showing of scienter, *see Pryor, supra,* at 98,904, actions brought under rule 14e–1(c), which was drafted pursuant to the SEC's authority to design reasonable means to prohibit fraud, need not allege or prove scienter.

## The Trigger Date

█ Caleb asserts that the determination of whether payment was prompt should use August 5, the undisputed date from which DuPont was contractually bound to purchase the stocks, not August 17, the termination date of the offer, as the initial point of analysis. Caleb admits that rule 14e–1(c) sets the *termination* of the offer as the trigger for application of the prompt payment requirement and admits further that the prospectus defined the termination date as August 17. Caleb urges, nonetheless, that by accepting the shares tendered for cash on August 5, and thereby entering a binding contract to purchase on the 5th, DuPont also bound itself to pay promptly after the 5th.

Caleb cites with force the prospectus and the DuPont releases and urges that an undertaking to make a prompt payment after acceptance has been breached. But that is not the issue under the pleading as it is now constituted. Rule 14e–1(c) by its terms applies only to that period following termination of the offer. Securities Act Release 16384, *supra,* states that the 14e–1(c) standard also applies to issuer tender offers under rule 13e–4(f)5, and Rule 13e–4(a)5 defines termination as "the date after which securities may not be tendered." The prospectus defined the termination date as the 17th.

The Commission, in the rules, moreover, has recognized the distinction between termination of the offer and acceptance of the shares for exchange. In rule 14d–7(a)(2), for instance, the Commission recognizes that prior to the commencement of the withdrawal period triggered by a competing tender offer, some shares may already have been accepted for payment. This "acceptance for payment" may well have occurred before the termination of the initial

tender offer. The distinction between acceptance for payment and termination of the offer is thus recognized in the rules, and the Commission, in its reasonable effort to design rules that would prohibit fraud, chose to make prompt payment a requirement only relative to *termination* of the offer.

■ Whether payment was prompt or not is an issue of fact to be determined in light of the facts and circumstances of a particular tender offer transaction and the customary practices of the financial community. *Pryor, supra,* at 98,910. This determination must await trial.

In all respects other than indicating the trigger date, the complaint has specified the material elements of the alleged fraud with adequate particularity. Consequently, Count One is dismissed with leave to replead the appropriate trigger date.

### B. Count 2: Sections 10(b) and 14(e), Rule 10b-5.

■ The second cause of action alleged by Caleb is brought directly under §§ 14(e) and 10(b), and Rule 10b-5. As indicated *supra,* when an action is brought directly under § 14(e) it is analytically identical to a 10b-5 action in all respects relevant here. *See Chris Craft, supra; Atchley, supra; Pryor, supra.* In order to plead this cause of action properly and survive DuPont's motion to dismiss, Caleb must allege that 1) DuPont misrepresented or omitted to state material facts in connection with the purchase or sale of a security; 2) Caleb relied to its detriment upon DuPont's misrepresentations or omissions; and 3) DuPont made the misrepresentations or omissions with scienter, that is, an intent to deceive, manipulate, or defraud. *See Rush v. Oppenheimer & Co., Inc.,* 592 F.Supp. 1108 (S.D.N.Y.1984); *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y. 1981); *Rosenbloom v. Adams, Scott & Conway, Inc.,* 521 F.Supp. 372 (S.D.N.Y. 1981), *aff'd,* 688 F.2d 816 (2d Cir.1982).

It has been stated that "a 10b-5 cause of action exists if the offeror, at the time it made its promise [to pay promptly] did not intend to keep its promise or it knew or perhaps was reckless in not knowing that it could not perform promptly." 5B Jacobs, *Litigation and Practice Under Rule 10b-5* § 193.06. This, in substance, is the content of Caleb's claim.

DuPont maintains, however, that Caleb's complaint is insufficient because the pleading alleges that DuPont's failure to reveal an intent to delay payment was an omission of a material fact rather than a misrepresentation. Having couched the complaint in terms of an omission of a material fact, Caleb, according to DuPont, failed to assert that there was any reliance on the omission. Because, according to DuPont, the failure to reveal an intent to delay payment, if such an intent was present, constitutes a misrepresentation, not an omission, reliance is a necessary element of the pleading. DuPont therefore seeks to dismiss the second count for failure to plead a 10b-5 action properly.

Caleb's pleading does assert that DuPont *omitted* in the Prospectus and the supplements thereto to disclose its intent to delay payment. And Caleb's brief, at 58–60, relies on *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Chris-Craft, supra,* and *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) to establish that proof of a material omission eliminates the necessity of establishing reliance.

■ The distinction between a misrepresentation and an omission is sometimes difficult to discern. *See generally* 5A *Jacobs, supra,* at § 61. However, the facts alleged by Caleb in this case constitute an allegation of misrepresentation, not of omission. DuPont in the prospectus stated that it would consummate the exchange "as promptly as practicable." The essence of Caleb's allegation is that this assertion was false and that DuPont intended all along to delay payment. In effect, Caleb is attempting to characterize the making of a statement which is alleged to be false as the omission of a declaration that the statement as initially made was false. Where a representation of fact or intent, such as

has been made here with respect to prompt payment, is alleged to be demonstrably false by virtue of a concealed intent to delay payment, the misrepresentation is not thus converted into an omission.

Because this 10b–5 action must be pled as a misrepresentation case, Caleb cannot rely on *Affiliated Ute, supra,* to avoid the necessity of pleading reliance on the stated intent to pay promptly. Because the complaint is deficient in that respect, the second cause of action must be dismissed with leave to replead.

### C.  Count Three: Aiding and Abetting

■ The third cause of action alleges that First Jersey aided and abetted DuPont in the violations alleged in Counts One and Two. The elements essential to a cause of action for aiding and abetting a violation of the securities laws are: 1) that there be a primary wrongdoer who has committed a violation of the securities laws; 2) that the person charged with aiding and abetting be shown to have acted or failed to act in a knowledgeable or reckless manner. (The recklessness standard has been held applicable only where the alleged aider and abettor stands in a fiduciary relationship to the victim); and 3) that the person charged with aiding and abetting be shown to have rendered substantial assistance in furthering the primary wrongdoer's violation. *See ITT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *Edwards & Hanley v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 484 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47–48 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

The first element is pleaded in Count One of this action.

■ The second element is properly pleaded because paragraph 38 of the complaint alleges actual knowledge of Du-Pont's intended delay in payment. Further, Caleb has asserted that First Jersey stood in a fiduciary relationship to Caleb and therefore that First Jersey's reckless disregard of DuPont's violation would also

satisfy the second necessary element. Although First Jersey disputes its status as a fiduciary, arguing that it served merely as a transfer agent, *Edwards, supra,* at 484; *Affiliated Ute, supra,* 406 U.S., at 151–52, 92 S.Ct. at 1471, the Letter of Transmittal tendering shareholders were required to execute, appointed First Jersey the "lawful agent and attorney-in-fact" of tendering shareholders. An agent and attorney-in-fact stands in a fiduciary relationship to the person for whom he acts. *Sim v. Edenborn,* 242 U.S. 131, 37 S.Ct. 36, 61 L.Ed. 199 (1916); *Hobsar v. Eaton,* 399 F.2d 781 (6th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969); *Detroit Lions, Inc. v. Argouitz,* 580 F.Supp. 542 (E.D.Mich.1984).

■ Although First Jersey argues that the authority granted by the Letter of Transmittal was limited to purely ministerial actions, it is specifically with respect to First Jersey's handling of those duties defined in the Letter of Transmittal that First Jersey is alleged to have violated its fiduciary responsibility. "An agent is a fiduciary with respect to matters within the scope of his agency." *Restatement of the Law of Agency,* 2d § 13. Specifically, Caleb alleges that by amending the Exchange Agent Agreement on August 4, First Jersey along with DuPont materially altered the financing arrangements surrounding the payment of tendering shareholders and the speed with which tendering shareholders would get paid. Even if the scope of First Jersey's fiduciary authority was limited, it is in the very area of that authority that First Jersey is alleged to have materially and detrimentally altered the rights of tendering shareholders. Such actions, if found to have been taken by First Jersey, do not satisfy the strict standard defined by the courts for fiduciaries. *See Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, J.). The reckless disregard standard therefore applies to First Jersey.

■ Similarly, while First Jersey argues that it did not provide "substantial assistance" to DuPont's alleged violation,

Caleb asserts and alleges that the terms of the August 4 amendment, which also provided an additional $600,000 fee for First Jersey, were essential to the plan to delay payment.

### Conclusion

The motion to dismiss is granted with respect to Count One, solely with respect to the trigger date. The motion to dismiss is granted with respect to Count Two. The motion to dismiss is granted with respect to Count Three in view of the limited dismissal of Count One. Leave to replead within twenty (20) days is granted. The parties are requested to determine a schedule for discovery and trial. Should they fail to do so, they should establish a date for a pretrial conference to set the necessary dates.

IT IS SO ORDERED.