CALEB & CO. and Unit & Co., partnerships, on Behalf of themselves and all others similarly situated, Plaintiffs,

v.

E.I. DuPONT de NEMOURS & COMPANY, First Jersey National Bank, and Conoco, Inc., Defendants.

No. 84 Civ. 4075 (RWS).

United States District Court, S.D. New York.

July 26, 1985.

Breed, Abbott & Morgan, New York City, for plaintiffs; Thomas A. Shaw, Jr., Thomas W. Kelly, Howard Wolfson, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendants E.I. DuPont and Conoco; Ronald S. Rolfe, Alan R. Glickman, Marc J. Apfelbaum, New York City, of counsel.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendant First Jersey Nat. Bank; Job Taylor, III, William K. Dodds, Maura Fecher, New York City, of counsel.

SWEET, District Judge.

This securities action, arising from the tender offer by E.I. DuPont de Nemours and Co. ("DuPont") for Conoco ("Conoco"), returns as the result of an amended complaint and a renewed motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). The motion is granted in part and denied in part, as set forth below.

## Prior Proceedings

The initial complaint in this action, filed by plaintiffs Caleb & Co. and Unit and Co. ("Caleb") on June 11, 1984, was the subject of a motion to dismiss brought by defendants DuPont, Conoco, and First Jersey National Bank ("First Jersey"). In an opinion reported at 599 F.Supp. 1468 (S.D.N.Y. 1984), this motion was granted in part and denied in part. An amended complaint was filed on February 1, 1985, and this renewed motion to dismiss was argued by skilled counsel on May 31, 1985.

## Facts

Familiarity with the facts underlying this action, as set forth in the earlier opinion, is presumed. The facts alleged in the amended complaint are the same as those in the original complaint in all material respects, except that it is alleged that the Board of Directors of Conoco declared a dividend on July 31, 1981, payable to shareholders of record as of August 14, 1981. It is further alleged that DuPont failed to make any reference to the dividend in the prospectus, any supplement thereto, or any press release or public announcement. For the purposes of this motion, the material allegations as contained in Caleb's complaint are taken as true, *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and in determining the legal sufficiency of the claims the exhibits annexed to the complaint will be considered. Fed.R.Civ.P. 10(c).

## The Complaint

On the facts alleged, Caleb asserts four causes of action. The first cause of action alleges that by delaying payment until after the termination of the offer, DuPont breached its obligation under Rule 14e–1(c), 17 C.F.R. § 240.14e–1(c), promulgated under Section 14(e) of the Securities Exchange Act of 1934, to pay cash promptly to plaintiffs in exchange for shares accepted for exchange for cash.

The second cause of action alleges that DuPont breached the contractual obligation created in the prospectus to pay cash as promptly as practicable for shares tendered by plaintiffs. Caleb alleges that the obligation to pay promptly was triggered on August 5, 1981.

The third cause of action alleges that First Jersey aided and abetted DuPont in the violations alleged in Counts One and Two, thereby breaching Rule 14e–1(c) and

First Jersey's fiduciary obligations to the class members.

The fourth cause of action alleges that DuPont and First Jersey violated contractual and fiduciary obligations owed to Caleb by prematurely transferring the shares to DuPont thereby permitting DuPont wrongfully to receive the dividend payable to shareholders of record on August 14, 1981.

DuPont and First Jersey have moved to dismiss each of the four counts of the amended complaint, and the counts will be addressed sequentially.

**Count One: Violation of Rule 14e–1(c)**

The earlier opinion held that the original complaint had satisfactorily plead a cause of action under Rule 14e–1(c) in all respects other than that it alleged payment to be due on August 5 rather than August 17. The amended complaint realleges a violation of Rule 14e–1(c) as a consequence of delayed payment, but asserts, as determined in the earlier opinion, that prompt payment was due on termination of the offer, August 17.

DuPont now challenges Count One on the theory that there is no private cause of action under Rule 14e–1(c), promulgated pursuant to the authority granted to the Securities and Exchange Commission ("SEC") in the final sentence of § 14(e). That section states in its entirety:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. *The commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.* (emphasis provided).

Rule 14e–1(c) states:

"As a means reasonably designed to prevent fraudulent, deceptive, or manipulative practices within the meaning of section 14(e) of the Act, no person who makes a tender offer shall:

. . . . . .

(c) Fail to pay the consideration offered or return the securities deposited by or on behalf of security holders promptly after the termination or withdrawal of a tender offer.

■ It is uncontested that a private right of action exists for an action brought directly under § 14(e). *See Stull v. Bayard,* 561 F.2d 429 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978); *Electronic Specialty Co. v. International & Controls Corp.,* 409 F.2d 937 (2d Cir.1969). No court has yet fully analyzed whether a private right of action exists under the rules promulgated pursuant to § 14(e), although in *Pryor v. United States Steel,* 591 F.Supp. 942 (S.D.N.Y. 1984), in denying a motion to dismiss a private action brought pursuant to Rule 14e–1(c), the Court implicitly held that such a cause of action exists. *See also Crouse-Hinds Co. v. Internorth, Inc.,* 518 F.Supp. 416, 449 (N.D.N.Y.1980) (private right under Rule 14e–1(a)); *Curtiss-Wright Corp. v. Kennecott Corp.,* 504 F.Supp. 1044, 1054 (S.D.N.Y.1980) (same); *Camelot Industries Corp. v. Vista Resources, Inc.,* 535 F.Supp. 1174 (S.D.N.Y.1982) (private right of action under 14e–3); *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179 (S.D.N.Y.1981) (same). The Supreme Court has stated that implication of a private right of action is fundamentally a matter of ascertaining Congressional intent, *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and the four factors identified in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) are properly viewed as indicia of an underlying Congressional intent. *Touche Ross, supra,* 442 U.S., at 575–76, 99 S.Ct. at 2488–89.

The first *Cort* factor inquires whether the plaintiff is a member of the class for whose benefit the statute was enacted. *Cort, supra,* 422 U.S., at 78, 95 S.Ct. at 2087. The Williams Act was designed to protect investors confronted with a tender offer, *Piper v. Chris Craft Indus.,* 430 U.S. 1, 3, 97 S.Ct. 926, 930, 51 L.Ed.2d 124 (1977), and there is no dispute that Caleb is a member of this class.

The second *Cort* factor asks directly whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one." *Cort,* 422 U.S., at 78, 95 S.Ct. at 2087. The terms of the statute are silent on this issue, and the legislative history does not reflect an explicit reference either to the creation or denial a private right of action. While the effort to divine Congressional intent from legislative silence is difficult even with respect to statutes actually drafted by Congress, it is necessary here to define a congressional intent with respect to regulations authorized by Congress but yet to be drafted by a regulatory commission. The conventional analysis that the existence of court decisions granting private rights of action before the statutory amendment appears inapplicable here. In this context, the remaining *Cort* factors acquire renewed significance, as indicia of Congressional purpose and goals, although some effort to clarify Congressional intent is nonetheless helpful.

Caleb argues that the state of the law with respect to private rights of action at the time Congress enacts a particular provision bears upon the knowledge and intent Congress had at the time of enactment. Silence in that context can reflect a desire not to disturb pre-existing private rights of action, as the Supreme Court explained in *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 378–79, 102 S.Ct. 1825, 1839–40, 72 L.Ed.2d 182 (1982):

> In determining whether a private cause of action is implicit in a federal statutory scheme when the statute by its terms is silent on that issue, the initial focus must be on the state of the law at

the time the legislation was enacted. More precisely, we must examine Congress' perception of the law that it was shaping or reshaping. When Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express enforcement provisions of the statute. When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts, however, the inquiry logically is different. Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy.

Rule 14e–1(c) was enacted pursuant to the authority vested in the SEC by the final sentence of § 14(e), which was itself enacted in 1970 as an amendment to the remainder of § 14(e). By 1970 the courts had created a private right of action under § 14(e), *see Butler Aviation Int'l v. Comprehensive Designers, Inc.,* 425 F.2d 842, 843 n. 1 (2d Cir.1970); *Crane Company v. Westinghouse Air Brake Co.,* 419 F.2d 787, 798–99 (2d Cir.1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); *Electronic Specialty Co. v. International Controls Corp.,* 295 F.Supp. 1063, 1071–72 (S.D.N.Y.1968), *aff'd in part, rev'd in part on other grounds,* 409 F.2d 937 (2d Cir. 1969), and Congress may be deemed to have been aware that the courts were upholding private rights of action directly under § 14(e).

However, the sentence authorizing the SEC to promulgate rules "reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative," 15 U.S.C. § 78(n)(e), altered the elements of the cause of action necessary to allege a violation. As the earlier opinion held, the rules issued pursuant to this sentence did not necessarily require an assertion of scienter to allege a violation. The SEC was given the authority to forbid acts that were not themselves fraudulent but could reasonably prevent fraud. Private actions under § 14e required a showing of

actual fraud, and the amendment was consequently more similar to a new right or provision with respect to which a Congressional understanding of the existing statute's authorization of a private right of action is less meaningful. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984). No facile leap can therefore be made from Congress' recognition in 1970 of a private cause of action under § 14(e) to Congress' implicit recognition of a private cause of action under the Rules promulgated pursuant to the amendment.[1]

DuPont argues further that by eliminating the element of actual fraud as an essential aspect of the cause of action Congress almost surely intended to restrict enforcement to the SEC. Analogizing to § 17(a), DuPont relies on the Honorable John E. Sprizzo's opinion in *Dannenberg v. Dorison,* 603 F.Supp. 1238 (S.D.N.Y.1985). Judge Sprizzo there refused to recognize a private right of action for negligence under § 17(a)(2) and (3), although in *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) the Court held that the SEC could bring an enforcement action under 17(a)(2) and (3) for negligent behavior. Because a private right of action under § 17(a) was recognized by the Second Circuit in *Kirshner v. U.S.,* 603 F.2d 234, 241 (2d Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979) on the reasoning that there was "little practical point in denying an action under § 17 once it is established that an aggrieved buyer has a private right of action under § 10(b)", which requires fraud, Judge Sprizzo felt the predicate for a private cause of action under § 17 was missing if fraud was not be pled. *Dannenberg, supra,* at 1240–41 n. 5. *See also Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 913 (S.D.N.Y.1983) (because plaintiff didn't state cause of action under § 10(b), it

"was clear that there is no private right under § 17(a).")

However, the predicate for a private cause of action under § 14 is not, as *Kirshner* implies it to be for § 17(a), an equivalent right under § 10(b). Private rights of action under the securities laws do not uniformly have as a prerequisite an allegation of fraud. In *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) the Court stated:

> Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement. The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. *Liability against the issuer of a security is virtually absolute, even for innocent misstatements.*

*Id.* at 381–82, 103 S.Ct. at 687 (emphasis added).

And in *Haas v. Wieboldt Stores, Inc.,* 725 F.2d 71 (7th Cir.1984), the Court recognized a private right of action directly under SEC Rule 14a–7b(1), which provides that "Copies of any proxy statement, form of proxy or other communication furnished by the security holder shall be mailed by the issuer to ..." *Id.* at 74. The Court stated that "Weiboldt did not mail Haas' proxy materials, and this was prima facie a violation." *Id.* Rule 14a–7(b)1) is therefore similar to rule 14e–1(c) in the absence of a requirement of fraud as an essential element of the pleadings. In recognizing private rights of action under rules issued pursuant to § 14, the predicate has not been fraud, but has been the violation of

---

1. The existence of a private right of action under Rule 10b–5 at the time of the 1970 amendment, *see Supt. of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971), also is not helpful,

because the relationship between Rule 10b–5 and Section 10(b) does not pose the problem faced here of a section that is violated only by fraud and a rule that can be violated without a showing of scienter.

rules designed by the SEC to reach the full range of its statutory authority. *See* § 14(a), and rules thereunder.

Although an intent of Congress to recognize a private right of action cannot be simply inferred by recognizing that a private right of action existed directly under § 14(e) at the time of the 1970 amendment, neither does the absence of fraud as an element of a 14e–1(c) violation compel a conclusion that Congress did not intend to extend a private right of action.

Even if express Congressional intent on the issue of a private right of action is difficult to discern directly, the third *Cort* factor—the consistency of a private right of action with the underlying purposes of the legislative scheme—can provide further guidance. Insuring full disclosure was certainly the primary objective of the Williams Act. *See Schreiber v. Burlington Northern,* —— U.S. ——, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985). However, the legislative history of the 1970 amendments similarly demonstrates a concern for preventing imprompt payment for tendered shares or other improper practices in the administration of tender offers. *See Additional Consumer Protection in Corporate Takeovers, 1970. Hearings on § 3431 Before the Subcomm. on Securities of the Senate Comm. on Banking & Currency, 91st Cong., 2d Sess. (1970).* The regulation of practices relating to the timing of payment was a direct concern of the Congress as established by the history of the amendment, and to find a private right of action to enforce Rule 14e–1(c) would further Congress' goals in enacting the statute.

Whether a private cause of action is necessary to effectuate the Congressional purpose bears on this factor. The existence of a private action for money damages after a failure to pay promptly is likely to be the most effective means of insuring enforcement of this rule. *See, e.g., Pryor v. U.S. Steel, supra.* An SEC injunction action will not be an effective remedy subsequent to a violation, and an injunction prior to the date payment is due may not be feasible, given the difficulty of knowing prior to the failure to pay of the impending violation. Finally, although the SEC might be able to bring a subsequent action for money damages, the complexities involved in insuring that funds would be disgorged to those properly the beneficiaries of any judgment, and the manpower necessary to achieve such a result make such actions unlikely. Such considerations were paramount in the Court's reasoning in *J.I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). "[U]nder the circumstances it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the Congressional purpose." *Id.* at 433, 84 S.Ct. at 1560. *See Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 714–15 (5th Cir.1984). Effective enforcement of Rule 14e–1(c), and other rules promulgated pursuant to § 14(e) will be assisted by recognition of a private right of action. *See, e.g., Crouse-Hinds Co. v. Internorth, Inc.,* 518 F.Supp. 416, 449 (N.D.N.Y.1980) (private right under Rule 14e–1(a)); *Curtiss-Wright Corp. v. Kennecott Corp.,* 504 F.Supp. 1044, 1054 (S.D.N.Y.1980) (same); *Camelot Industries Corp. v. Vista Resources, Inc.,* 535 F.Supp. 1174 (S.D.N.Y.1982) (private right of action under 14e–3); *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179 (S.D.N.Y.1981) (same).

The final *Cort* factor inquires whether the cause of action is one "traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Cort,* 422 U.S., at 78, 95 S.Ct. at 2088. The entire structure of the Williams Act, especially § 14, indicates that the regulation of tender offers was a major concern of Congress, and the creation of a private right of action based on federal law would not amount to the improper incursion of federal law in a state domain.

■ After analyzing the *Cort* factors, I conclude that a private right of action exists to enforce Rule 14e–1(c). The stated purpose to insure prompt payment by tender offerors for tendered shares, and

the likelihood that a private right of action will insure the more effective enforcement of Rule 14e–1(c) combine to support this conclusion, which is buttressed by the implicit recognition of other courts that rules promulgated under § 14(e) may be enforced in private actions.

### Count Two: Breach of Contract to Pay August 5

■ The second count of the complaint alleges that DuPont breached its contractual undertakings by failing to exchange cash for shares tendered and accepted as promptly as practicable after the acceptance of these shares on August 5, 1981.

DuPont offered and contracted in the prospectus that:

Upon the terms and subject to the conditions of the Offer, the exchange of DuPont Shares or cash for Conoco Shares validly tendered and not withdrawn will be made as promptly as practicable after the latest of

(i) the tender of such Conoco Shares,

(ii) 12:00 Midnight, New York City Time, on August 4, 1981,

(iii) approval of the DuPont stockholders of the proposal to amend the certificate of Incorporation of DuPont to increase the authorized number of DuPont Shares and to approve the issuance of DuPont Shares in connection with the acquisition of Conoco, at a meeting called for August 17, 1981,

(iv) the expiration of the waiting period applicable to the Offer under the HSR Act in connection with the Purchaser's acquisition of the Conoco Shares or

(v) with respect to any Conoco Shares not theretofore accepted for exchange, the expiration of any withdrawal period resulting from the commencement of a tender offer for Conoco Shares by another bidder.

*Notwithstanding clause (iii) above, the Purchaser reserves the right (but shall not be obligated) to accept Conoco Shares in exchange for cash prior to DuPont stockholder approval.* (emphasis added) *Prospectus at 7–18.*

According to Caleb, despite the language quoted above which conditions the obligation to pay as promptly as practicable upon the occurrence of five events, the obligation was triggered by DuPont's acceptance of the shares on August 5 as permitted by the underscored language, *supra.* The terms of the prospectus defeat this claim. The prospectus is unambiguous: no obligation to pay promptly arises until all five events have occurred, and the underscored provision does not limit the rights of DuPont. Instead, it extends to DuPont an additional right: that of accepting the Conoco shares tendered for cash, as opposed to those tendered for stock-for-stock exchange, prior to the August 17 shareholder meeting. This paragraph, however, does not create an obligation to pay promptly at the time of acceptance. The phrase "in exchange for cash" does not modify "accept" so that the right to accept the shares is conditioned on an "exchange for cash prior to DuPont stockholder approval." The phrase "in exchange for cash" modifies "shares," to reflect that only those shares tendered for cash, not those tendered for a stock-for-stock exchange, could be accepted without DuPont shareholder approval. The underscored passage does not limit the prior paragraph's requirement that all five conditions occur before a requirement of prompt payment arises, and DuPont's exercise of its right to accept shares does not provide a legal foundation for the second count.

■ Caleb attempts to counter the obligations defined in the prospectus by relying on various press releases issued by DuPont over the course of the tender offer. Although extrinsic evidence is not appropriate where a contract is unambiguous, *Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1032 (Ct.App.1979), the press releases do not constitute an obligation to pay promptly prior to the August 17 shareholders meeting. The press releases state:

DuPont's obligation to accept Conoco shares pursuant to its offer is conditioned, among other things, on the approval of the issuance of DuPont shares in connection with the Conoco acquisition at a special meeting of DuPont stockholders on August 17. DuPont said, however, that under the terms of its offer as described in its Prospectus dated July 15, it has reserved the right (but is not obligated) to accept and pay for Conoco shares tendered for cash prior to such DuPont stockholder approval, provided that other conditions to such acceptance have been satisfied.

On August 5 a press release stated: *DuPont has accepted* all shares tendered for cash at the close of the withdrawal period last night and began paying $98 for each shares ... today, *in accordance with the terms and conditions of the offer.* (emphasis added)

■ These press releases, consistent with the prospectus, state only that DuPont had the right to accept certain shares prior to August 17 and failed to create an obligation to pay prior to the August 17 date set in the prospectus. Neither DuPont's unilateral payments prior to the 17th as alleged in the amended complaint nor the press releases issued after the withdrawal period had expired, created an independent obligation or altered the interpretation of the prospectus described above.

The contract controlling the prompt payment requirement does not require that DuPont pay promptly until each of the five conditions had occurred. Count Two will therefore be dismissed to the extent that it is premised on an obligation to pay promptly prior to August 17.

### Count Three: Aiding and Abetting

■ First Jersey again has moved to dismiss the allegations that it aided and abetted DuPont in violating Rule 14e–1(c). *See* 599 F.Supp. 1468, at 1475–76. First Jersey now argues that because DuPont is alleged to have violated Rule 14e–1(c) and not 14(e) itself, and the prohibitions of 14e–1(c) extend only to "tender offerors" while 14(e)'s prohibitions extend to "any person," the aiding and abetting count cannot stand. This argument fails to recognize that the party charged with aiding and abetting need not commit, or be able to commit, the primary violation. The first element necessary to a proper allegation of an aiding and abetting count is "the existence of a securities law violation by the primary (*as opposed to the aiding and abetting*) party;" *ITT, An Intern. Inv. Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980) (emphasis added). Whether First Jersey violated, or even is able to violate, Rule 14e–1(c), is not material to the pleadings.

The remaining two necessary elements of an aiding and abetting charge, "knowledge" and "substantial assistance," *id.,* are also plead. First Jersey argues, however, that it is illogical to permit an aiding and abetting count which requires knowledge or scienter when the primary violation under 14e–1(c) has no such requirement. However, the necessary proof of knowledge and scienter on the part of the aider and abettor derives not from the scienter requirement which may be an element of the primary violation but from the independent requirement that an aider and abettor be aware of and possess the requisite scienter with respect to his own actions in assisting the primary violation. In order to establish aiding and abetting liability, Caleb will have to establish First Jersey's knowledge that imprompt payment was improper, even though Caleb will not have to establish this element to recover from DuPont. The third cause of action is properly plead.

### Count Four: Entitlement to the Dividend

The amended complaint alleges that First Jersey improperly permitted DuPont to acquire the tendered shares, prior to payment, before the August 14 record date for the $0.65 quarterly Conoco dividend, thereby permitting DuPont improperly to receive the dividend. It is undisputed that Conoco declared a $0.65 per share dividend on July 31, 1981, payable on September 14 to stockholders of record on August 14. DuPont accepted and purchased the shares

on August 5, although it did not pay for them until after August 14. The issues that must be resolved are first whether DuPont's acceptance without payment on August 5 made it the record owner on August 14, and second, which holder has the right to a cash dividend when the dividend is declared before a sale of stock but the shares are sold before the record date but after the declaration.

## A. DuPont's August 5 Acceptance

■ DuPont's acceptance of tendered shares on August 5 vested in DuPont the right to be considered the record owner on August 14, even though payment for the shares post-dated August 14. The principle was explained and held to be uniformly applicable by Professor Williston, who stated:

> The uniform statutes, in force in all of the states in one form or another, definitely provide ... that legal title to stock passes to the buyer upon delivery of the certificate in proper form. But the passing of legal title may, or may not, be coterminous with the passing of the risks, and the rights of ownership, in the shares. Moreover, all of the rights, or obligations, of ownership may not pass at the same time. Thus, the purchaser of shares, absent any agreement to the contrary, is generally entitled to dividends, rights and all the privileges of a shareholder, except voting power, from the time he makes the purchase contract, *whether or not he has made payment,* has taken legal title or has been registered on the corporation records as a shareholder.

8 Williston on Contracts § 953 at 320–21 (1964) (footnotes omitted) (emphasis added).

In *Lafountain & Woolson Co. v. Brown,* 91 Vt. 340, 101 A. 36, 37 (1917), the court explained that "[t]he principle of equitable assignments applies. The purchaser of shares of corporate stock is held to acquire an equitable interest in the stock before the transfer is completed, if the agreement of purchase and sale is binding between the parties." *Id.* The contract between the

tendering shareholders and DuPont became binding on August 5, and DuPont thereby could benefit from the principle of equitable assignments in order to be considered the owner of record.

## B. Declaration Date v. Record Owner

■ An examination of the Delaware authorities, recognized by both parties to be binding here, establishes that an owner as of the record date but not the declaration date is the beneficiary of the dividend. A sale between the declaration and record dates causes the dividend to inure to the benefit of the purchaser.

The tension between the declaration date and the record date results from the desire of corporations to clarify their own liability for dividend payments.

> Before the record date problem arose the courts with very few exceptions held that dividends belonged to the owner of the stock on the date the dividend was declared. However, the practice of most corporations today is to declare the dividend to be payable to shareholders on a date of record between the declaration date and the date set for payment. The original purpose of such a practice was undoubtedly to protect the corporation, so that when it paid a dividend to the person registered on the books on the record date no liability would fall on the corporation of such person were not the actual owner on that date. However, many courts have held that the record date is the effective date of the dividend and the actual owner on the date of record is entitled to the dividend even though he may not be the owner registered on the books of the corporation. Some courts have not accepted this view and retain the rule that title vests on the date of the declaration. The numerical majority follows the reasoning of the Connecticut Supreme Court in *Richter & Co. v. Light* [97 Conn. 364, 116 A. 600 (1922)], whereas the minority in number is led by New Jersey.
> "...

"It would seem clear that the majority of states, both in number and importance, favors the Connecticut rule, and that the trend is increasingly in that direction." Note, *Dividends—To Whom Payable When Record Date Is Given,* 7 Ohio St. U.L.J. 431, 437–39 (1941) (footnotes omitted).

When there is both a declaration date and a record date, the declaration of the dividend creates a debtor-creditor relationship between the corporation and the owner of the stock on the date of declaration:

It seems to be true that upon the declaration of a lawful dividend by a Board of Directors that the relation of debtor and creditor is set up between the corporation and the stockholder. In most cases the right set up in the stockholder is an irrevocable right and the declaration of the lawful dividend creates an obligation of the corporation and there exists a right to action on the part of the stockholder to enforce its payment. The right of action is in the nature of a contract and grows out of the declaration of a lawful dividend. The actual wording of the Resolution, the physical minutes, constitute mere matter of Record.

*Selly v. Fleming Coal Co.,* 37 Del. 34, 180 A. 326, 328 (1935).

The theory [is] that when a dividend is declared, it is, in effect, set aside by the corporation, as money in hand, for the benefit of the stockholder entitled, though it is not then payable. *Wheeler v. Northwestern Sleigh Co., C.C.,* 39 F. 347; *Cogswell v. Second Nat'l Bank,* 78 Conn. 75, 60 A. 1059; 38 Harv.Law.Rev. 247. This creates a debtor and creditor relation, and if such dividend is not paid when due it may be recovered in an appropriate action by the stockholders.

*Wilmington Trust Co. v. Wilmington Trust Co.,* 25 Del.Ch. 193, 15 A.2d 665, 667 (1940). However, the ultimate beneficiary of the dividend will still be controlled by owner of the stock on the record date. As the court explained in *Wilmington Trust, supra,* the debtor-creditor relationship between the corporation and stock owner arising at the time of declaration of the dividend was not ultimately controlling.

The general rule is that the estate of the life beneficiary of the income is entitled to all regular cash dividends that have been declared during her lifetime, *for the benefit of the stockholders of record on dates prior to her death,* though such dividends are not actually payable or receivable by the trustees until dates subsequent thereto.

15 A.2d 665, 667. (emphasis added). *See Memorandum by the Executive Secretary and Director of Research of the Law Revision Commission relating to senate Int. No. 674, Pr. No. 693, New York,* (citing *Wilmington Trust* as evidence of Delaware's acceptance of the modern trend using record date, not declaration date, as basis for determining beneficiary of dividend); *In re Bashford's Estate,* 178 Misc. 951, 36 N.Y.S.2d 651 (1942) (same); 3 *Scott on Trusts* § 236.2 (1967) (same).

The Delaware Code also establishes the supremacy of the record date over the declaration date for the establishment of shareholder rights:

(a) In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the board of directors may fix, in advance, a record date, which shall not be more than 60 nor less than 10 days before the date of such meeting, nor more than 60 days prior to any other action.

*See Fletcher, Cyclopedia of the Law of Private Corporations* § 5379 (citing Del. Code Title 8, § 213 as statutory alteration of rule of declaration date entitlement); 12 Del.Code Ann. Title 12 § 6104(e) (establish-

ing priority of corporate specified record date over declaration date).

The cases relied on by Caleb do not confront the question of the priority of declaration date or record date when the stock transfer occurs between the two. In *Bryan v. Aiken*, 10 Del.Ch. 446, 86 A. 674 (1913) both the declaration date and record fell before the death of the life tenant, and the issue faced by the Court was whether a stock dividend should be viewed as principal, thereby belonging to the remainderman. In *Selly v. Fleming, supra*, the Court did not face a conflict between record and declaration dates, and the cited language merely reaffirms that the declaration of a dividend creates a debtor-creditor relationship. The ultimate beneficiary of the relationship, as determined by a subsequent record date owner, was not at issue. Similarly, in *Kraft Foods Co. v. Commissioner of Internal Rec.*, 232 F.2d 118 (2d Cir.1956), the legal consequence of a conflict between the owner on the declaration date and on the record date did not arise. Finally, although the Court in *Silco, Inc. v. United States*, 591 F.Supp. 480 (N.D.Tex.1984) held that *Selly, supra,* and *Kraft, supra,* seemed to hold that the declaration date created a right to dividends, the Court was not required to investigate the issue fully, because federal law controlled the tax liability issue in question.

 Even though neither *Wilmington Trust, supra,* nor the Delaware Code section cited above, directly resolve the confrontation here, I conclude that their clear implication is that the owner as of the record date is the proper recipient of the dividend. Caleb's final cause of action is therefore dismissed.

### Conclusion

DuPont and First Jersey's motion is granted to the extent that the second and fourth causes of action are dismissed. Discovery shall be completed by December 11, 1985 and a joint pretrial order submitted by December 24, 1985.

IT IS SO ORDERED.